**PEOPLE OF THE VIRGIN ISLANDS, Plaintiff**

**v.**

**JAMAL ALLISTER MORTON, [D.O.B. 01-26-82], Defendant**

No. ST-11-CR-194

Superior Court of the Virgin Islands

Division of St. Thomas and St. John

November 18, 2011

DOUGLAS SPROTTE, ESQ., Assistant Attorney General, Virgin Islands Department of Justice, St. Thomas, USVI, *Attorney for the Plaintiff.*

ROBERT EBERHART, ESQ., St. Thomas, USVI, *Attorney for the Defendant*.

HOLLAR, *Judge*

## MEMORANDUM OPINION

(November 18, 2011)

### I. FACTS and PROCEDURAL POSTURE

On April 27, 2011, the People filed a five-count Information against Jamal Allister Morton charging him with: First Degree Murder, in violation of V.I. CODE ANN. tit. 14 §§ 921, 922(a)(1); Unauthorized Possession of a Firearm During the Commission of First Degree Murder, in violation of V.I. CODE ANN. tit. 14 § 2253(a); First Degree Assault, in violation of V.I. CODE ANN. tit. 14 § 295(1); Unauthorized Possession of a Firearm During the Commission of First Degree Assault, in violation of V.I. CODE ANN. tit. 14 § 2253(a); and Reckless Endangerment in the First Degree, in violation of V.I. CODE ANN. tit. 14 § 625(a).

At the Final Pre-Trial Conference on September 21, 2011, the prospect of a global plea was raised, however, due to a misunderstanding regarding Defendant Morton's detection location, discussions between the Defendant and his counsel regarding the extended global plea, or simply a plea, had not taken place. The matter was then rescheduled for a status/change of plea hearing the following day to allow the plea offer to be fully explored. Having been advised at the Status/Change of Plea Hearing on September 22 that Defendant Morton rejected the People's plea offer, the Court scheduled jury selection and jury trial for October 3, and October 7, 2011, respectively.

On September 30, approximately eight (8) days after the Defendant rejected the plea offer and with the trial date already scheduled, the Court received a *pro se* motion from the Defendant, dated September 20, 2011, to "Discharge Counsel and for Appointment of Replacement Counsel." In his motion, Defendant Morton cited a broken and irreparable relationship between himself and his counsel together with a failure to receive any discovery.[1] The Court denied the motion, finding Defendant's contentions

---

[1] At the Status/Change of Plea Hearing held on September 22, 2011, Counsel for Defendant Morton disclosed that he transmitted all discovery forwarded by the People to the Defendant at the Bureau of Corrections in St. Thomas. This was done prior to Defense Counsel being

unsubstantiated after having observed a cordial relationship between the Defendant and his counsel, as well as Defense Counsel's vigorous in-court advocacy.[2]

On October 3, a lengthy and exhaustive jury selection was conducted. Prior to "swearing-in" the jury on October 17 an "in-chamber conference" with counsel took place to discuss concerns relative to Juror #1.[3] In chambers, both counsels were informed about a call received by an unidentified individual the week before. The individual conveyed to the Judge's secretary that Juror #1 misunderstood a question during *voir dire* on October 3, and as a result, failed to disclose to the Court that her son had been recently arrested on gun charges.[4] Juror #1 also failed to mention that her son, Keith Dawson,[5] was scheduled for sentencing by the undersigned on October 11, 2011, but was postponed to October 14, which coincidentally was the last business day before the trial in this case was to begin.

When responding to the jury questionnaire, Juror #1 apparently suffered from "selective" amnesia, disclosing only that "her nephew," unidentified by name, had been arrested. Disturbingly, however, it was later discovered that Juror #1's nephew is Neville Potter, Jr., an individual who had been recently convicted and sentenced for a double homicide. Adding insult to injury, not only was the undersigned the sentencing judge in *People of the Virgin Islands v. Keith Dawson* and *People of the Virgin Islands v. Neville Potter, Jr.*,[6] but the prosecutor in the *Dawson* and *Potter* matters is also the same prosecutor assigned to the case *sub judice*. Given the familiar "cast of characters," it appeared highly unlikely that Juror #1 had inadvertently forgotten to disclose on her juror questionnaire that her son was "arrested" and/or that she misunderstood the Court's questions during *voir dire*.

---

advised that the Bureau of Corrections had transferred Defendant Morton to the detention correctional facility in St. Croix.

[2] *See* Order by the Court dated September 30, 2011.

[3] Both Counsel for the People and the Defendant were present during the in-chamber conference, however, Defendant Morton was not.

[4] This critical piece of information is also lacking from the responses on Juror #1's questionnaire as well.

[5] *See People of the Virgin Islands v. Keith Dawson*, Case No. ST-10-CR-439.

[6] Case No. ST-10-CR-439 and Case No. ST-09-CR-078, respectively.

After concluding the in-chamber conference, the matter continued in open court and Juror #1 was summoned to give testimony regarding the information provided to the Court via telephone the previous week. Juror #1 was sworn-in and took the witness stand. Before any inquiry, Juror #1 was advised of her constitutional rights, following which she invoked her Fifth Amendment privilege against self-incrimination. All further inquiries were immediately aborted and Juror #1 was discharged without objection from either counsel. Out of an abundance of caution, and by request of Defense Counsel, the Court *voir dired* each remaining juror to determine if any communication was made with Juror #1, which could "taint" their objectivity and impartiality towards the case under consideration. Each juror responded in the negative.

Following *voir dire* of the jurors, the Court heard the People's Motion *in Limine* to "Admit Other Crimes, Wrongs or Acts Pursuant to F.R.E. 404(b)."[7] The People argued that their expert ballistics report would establish that the stolen firearm Defendant Morton pled guilty to possessing on August 20, 2010, was the same firearm utilized in the murder of the underlying matter. After due deliberation, the Court granted the People's motion, allowing Defendant Morton's guilty plea to the charge of "receiving a stolen firearm" to be admitted into evidence in the case *sub judice*.[8] Thereafter, the Court recessed for five (5) minutes before starting the trial.

Before reconvening, a Superior Court Marshal advised the undersigned that Defense Counsel requested a private conference before the case resumed. Upon reconvening, a sidebar[9] was held during which Defense Counsel alerted the Court that during the recess Defendant Morton made violent threats towards him in the presence, and hearing, of Detective Dwight Griffith. Detective Griffith confirmed that he was privy to the audible exchange between Defendant Morton and his attorney and that he did indeed hear Defendant Morton make violent threats towards his attorney and his family. The Court recessed for lunch in order to further assess the situation.

---

[7] *See* People's Motion filed September 19, 2011.

[8] The Court also ruled that a cautionary instruction would be given following the admission of the Defendant's guilty plea for the August 20, 2010 case.

[9] During the sidebar conference, Defendant Morton was kept in "lock-up" and was not present in the courtroom.

At the conclusion of the lunchtime recess, an immediate sidebar conference was again requested. Counsel for Defendant Morton stated that, during the recess, another threat was made towards him in the Fort Christian parking lot by an individual[10] transported by Defendant Morton's mother, who at that time was a Detective assigned to the Investigation Bureau at the Virgin Islands Police Department. Given the information communicated to the Court and the state of mind of Defense Counsel regarding the alleged threats, the Court was constrained to permit counsel to withdraw from the case. The withdrawal,[11] of course, necessitated postponement of the trial *sine die*. Therefore, the jury was discharged.

Prior to adjourning, the Court made inquiry into the need for a "waiver and/or forfeiture of counsel" hearing based on the allegations of misconduct. Brief arguments were heard, following which the Court scheduled a Waiver/Forfeiture of Counsel Hearing for October 27, 2011.[12] Prior to the hearing, on October 18, special counsel was appointed to represent the Defendant at the hearing.

At the Waiver/Forfeiture of Counsel Hearing, the People first called Detective Dwight Griffith, the Case Agent in the underlying matter. Detective Griffith testified that on October 17, 2011, while seated at the People's table approximately ten (10) feet away from the defense table, and before the trial began, he overheard an exchange between the Defendant and his attorney. Detective Griffith heard Defendant Morton's voice elevate substantially as he accused his counsel of being part of a conspiracy to incarcerate him. Detective Griffith testified that Defense Counsel attempted to convey to Morton the strength of the People's evidence against him, and in turn, suggested that a plea agreement might be in his best interest. In response, the Defendant became irate and made

---

[10] This individual was later identified as Defendant Morton's brother.

[11] On October 17, 2011, this Court allowed the then appointed Defense Counsel to formally withdraw from the instant case.

[12] On October 20, 2011, the People filed for a Motion for Forfeiture of Counsel Hearing which further outlines the People's position in regards to same.

threats of bodily injury and/or death towards Defense Counsel and his family.[13]

The People's second witness called to testify was the Defendant's attorney. Defendant's counsel testified that during the lunch recess, as he walked from the Alexander Farrelly Justice Complex courtyard to the Fort Christian Parking lot, he saw Defendant Morton's mother drive up alongside him in an unmarked police vehicle. Upon stopping, a young man quickly exited the vehicle and approached him, such that both their faces were separated by approximately one (1) to two (2) feet. The young man said to him, "You're a joke. You will see." According to Counsel, the Defendant's mother told the young man to "Cut it out." The young man returned to the car from which he exited and no further communication took place.[14] Defense Counsel further testified that on the same afternoon his daughter received a suspicious phone call, at her place of employment, from a man named "Bobby". Although this "Bobby" told the daughter to meet him outside in two minutes, his daughter declined to do so since she knew no one by that name.

On cross-examination, Defense Counsel described the relationship between himself and Defendant as "cordial" and "professional", adding that he was unaware Defendant Morton had moved for his removal as counsel until approximately one week before the October 17 trial date when he received the Court's Order denying the request. When asked about the frequency of his communications with the Defendant, he testified that he visited Defendant Morton at least twice at the Bureau of Corrections (hereinafter "B.O.C.") in St. Thomas, and made several phone calls, although he could not recall specific dates. Defense Counsel did recall a period of time during which discovery materials were sent to B.O.C., when unbeknownst to him, Defendant had been relocated to a different facility on St. Croix. Once he was made aware of his client's location, all subsequent discovery was forwarded to him in St. Croix. Defense Counsel also expressed his belief that the Defendant may have

---

[13] Specifically, Detective Griffith's testimony was that Defendant Morton said to his attorney statements to the effect of "You're not working for me. You're working against me." and "I can kill you too." and "I tried to get rid of you before."

[14] Defense Counsel described the individual as being about six feet and one to two inches tall, wearing a yellow stripped polo shirt. A young man matching this exact description was present in the back of the courtroom after the Court reconvened from the lunch recess.

been dissatisfied with the delay in receiving discovery materials. When asked to describe the events leading up to the threats of violence, Defense Counsel corroborated much of Detective Griffith's testimony,[15] adding that the Defendant appeared initially agitated when the Court relieved Juror #1 from the panel.

The People then called Defendant's mother, who testified that she was a veteran of the Virgin Islands Police Department.[16] Defendant's mother testified that on October 17, as she drove by the Superior Court to drop off one of her sons,[17] she saw Defendant Morton's attorney outside. Her son, having exited the vehicle, approached Defense Counsel and said to him, "You're a joke. Jamal needs to get another attorney." In response, she reprimanded her son by stating "You have no right to say that. You will only make it worse for your brother."

Thereafter, the People rested. Because charges against Defendant Morton were being contemplated in connection with the alleged threats, special counsel for Defendant Morton informed the Court that he would not be calling him to testify on his own behalf. The Court then took the matter under advisement.

## II. ANALYSIS

The issues to be resolved by this Court are: (1) whether Defendant Morton relinquished his Sixth Amendment right to counsel as a result of waiver by conduct; and (2) whether the serious misconduct, extreme dilatory tactics, and/or egregious behavior engaged into by Defendant Morton warrant forfeiture of his Sixth Amendment right to counsel.

---

[15] Defense Counsel also testified that Defendant Morton stated "you don't know who you are messing with" prior to making violent threats towards him and his family.

[16] The Court is unaware of whether the Virgin Islands Police Department erected an appropriate "Chinese Wall" to prevent the appearance of impropriety and/or conflict of loyalties that may have existed between the mother's job and her son's prosecution.

[17] On re-direct, the People inquired whether the Detective had brought her son to the trial in compliance with the Subpoena Duces Tecum issued by the Court. She responded that she had, but that the *subpoena* had named her other son, who was not involved in the exchange with Defense Counsel. At this point the Court inquired whether the parties would like to request the correct son's appearance. Both parties declined.

## A. Defendant Morton Did Not Relinquish His Sixth Amendment Right To Counsel Through Waiver By Conduct.

■ The Sixth Amendment to the United States Constitution reads in pertinent part that "[i]n all criminal prosecutions, the accused shall enjoy the right to . . . have the Assistance of Counsel for his defence."[18] Although the right to counsel is a "fundamental" right deemed essential to fair adjudication,[19] the right is not absolute, and "[a] defendant may lose his or her right to counsel through forfeiture or waiver."[20]

■ 'Waiver' involves a knowing, intelligent, and voluntary relinquishment of a known right, whereas 'forfeiture' results in the loss of a right regardless of a defendant's knowledge of, or intent to effect, such a relinquishment.[21] 'Waiver by conduct' is an intermediate channel, between 'waiver' and 'forfeiture', through which a Defendant may lose, or "waive," his Sixth Amendment right to counsel because of his own dilatory or abusive conduct.[22] "Waiver by conduct . . . occurs when a defendant competent to waive counsel moves to remove his attorney without good cause, the motion is denied, and the judge warns the defendant that he will lose his right to an attorney if he engages in further dilatory or abusive conduct towards his attorney."[23]

■ This warning is instrumental in a finding of 'waiver by conduct.'[24] If the judge does not warn the defendant that his continued dilatory or abusive conduct will result in the loss of his right to counsel, then the Defendant cannot act knowingly, and there is no basis for an implied waiver.[25] The warning itself must adequately communicate the consequences of Defendant's conduct, and the consequences of

---

[18] U.S. CONST. amend. VI. The Sixth Amendment to the United States Constitution is made applicable in the United States Virgin Islands by virtue of Section 3 of the Revised Organic Act of 1954, as amended.

[19] *United States v. Goldberg*, 67 F.3d 1092, 1097 (3d Cir. 1995) (citing *Powell v. Alabama*, 287 U.S. 45, 53 S. Ct. 55, 77 L. Ed. 158 (1932); *Gideon v. Wainwright*, 372 U.S. 335, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963)).

[20] *United States v. Thomas*, 357 F.3d 357, 362 (3d Cir. 2004) (citing *United States v. Leggett*, 162 F.3d 237, 249 (3d Cir. 1998)).

[21] *Goldberg*, 67 F.3d at 1099-1100; *See also id.* at 362.

[22] *See Goldberg*, 67 F.3d at 1100.

[23] *Commonwealth v. Means*, 454 Mass. 81, 907 N.E.2d 646, 657 (2009).

[24] *Means*, 907 N.E.2d at 658.

[25] *See id.*

proceeding *pro se*.[26] If, after being so warned, the Defendant continues to engage in dilatory or abusive conduct, "the misconduct may be treated as an implied request to proceed *pro se* and, thus, as a waiver of the right to counsel."[27] Such conduct need not be violent in order to rise to the level of conduct constituting waiver, but it must be "highly disruptive" of order or safety in the courtroom.[28]

Morton did attempt to remove his appointed counsel on September 30, 2011 for reasons discussed *supra*.[29] In its responsive order issued the same day, the Court determined that Defendant Morton's assertions were unsubstantiated and that there was no good cause for the motion.[30] However, the Court's Order improvidently failed to warn the Defendant that future dilatory tactics, disruptive conduct and/or abusive behavior could result in the loss of his right to counsel. So, despite the Court's finding that Defendant did engage in dilatory conduct in requesting new counsel after the first trial was scheduled, and that he did engage in conduct designed to postpone the proceedings on the day of trial, without a previous warning, 'waiver by conduct' cannot be implied or established.

## B. Serious Misconduct, Dilatory Tactics, And Egregious Behavior Engaged Into By Defendant Morton Warrant Forfeiture Of His Sixth Amendment Right To Counsel.

■ 'Forfeiture,' however, unlike 'waiver' or 'waiver by conduct', can be found despite the absence of warning to the defendant about the consequences of engaging in misconduct and without advisement of the risks of proceeding *pro se*.[31] Consequences of 'forfeiture' can include the "loss of a right irrespective of the defendant's knowledge and/or his intent to relinquish same."[32] A court may find that a defendant has "forfeited"

---

[26] *Id.*

[27] *Goldberg*, 67 F.3d at 1100 (citing *United States v. Bauer*, 956 F.2d 693 (7th Cir. 1992)).

[28] *Means*, 907 N.E.2d at 658.

[29] *See* Defendant Morton's *pro se* Motion to Discharge and for Appointment of Replacement Counsel filed September 30, 2011.

[30] *See* Order by Court dated September 30, 2011.

[31] *Goldberg*, 67 F.3d at 1101.

[32] *United States v. Leggett*, 162 F.3d 237, 250 (3d Cir. 1988) (citations omitted).

his Sixth Amendment right to counsel after having engaged in "extremely dilatory conduct" or "extremely serious misconduct."[33]

■ What constitutes extremely dilatory conduct or extremely serious misconduct is a factual inquiry to be determined on a case-by-case basis.[34] In *United States v. McLeod*, the court found the defendant in that matter "forfeited" his right to counsel due to defendant's verbal abusiveness, threats to harm his attorney, and attempts to make his attorney engage in unethical activities.[35] Similarly, in *United States v. Thomas*, the Court of Appeals for the Third Circuit also held the defendant "forfeited" his right to counsel due to his misconduct. The Defendant in *Thomas*, was appointed four different attorneys, was verbally abusive, made violent threats, blatantly refused to cooperate with counsel, and attempted to force his attorneys to file several meritless, frivolous motions on his behalf.[36] Thus, threats of violence made by a defendant against his attorney, or the attorney's family, may constitute "extremely serious misconduct" that may justify a finding that a defendant has forfeited his right to counsel.[37]

■ In this instance, Defendant Morton made violent threats to commit severe bodily harm, injury, and death to Defense Counsel and his family in open court. While this Court in the absence of a warning cannot establish waiver on account of Defendant Morton's conduct, this Court does find that no warning is necessary to strip Defendant Morton of his Sixth Amendment right to counsel given his uncontroverted brash display of egregious behavior towards his counsel and the strategic measures employed to delay his trial. Therefore, the Court finds that Defendant Morton's conduct was not only reprehensible and indefensible, but falls squarely within the realm of "extreme dilatory tactics", "serious misconduct" and "egregious behavior" sufficient to warrant 'forfeiture', rather than waiver of his right to counsel.

---

[33] *Thomas*, 357 F.3d 357 at 362.

[34] *See United States v. McLeod*, 53 F.3d 322 (11th Cir. 1995); *Thomas*, 358 F.3d 357; *Goldberg*, 67 F.3d 1092; *Leggett*, 162 F.3d 237; *Means*, 907 N.E.2d 646.

[35] *McLeod*, 53 F.3d 322; *See also Thomas*, 358 F.3d at 362-63 (stating that Third Circuit has cited *McLeod* approvingly in other forfeiture cases).

[36] 357 F.3d 357.

[37] *Means*, 907 N.E.2d at 652 (citations omitted); *See also United States v. Goldberg*, 67 F.3d 1092 (3d Cir. 1995) (articulating difference between forfeiture and waiver but finding no forfeiture on grounds unrelated to defendant's conduct).

## III. CONCLUSION

Although Defendant Jamal Morton did not relinquish his Sixth Amendment right to counsel by "[implied] waiver," Defendant Morton's serious misconduct, dilatory tactics, and egregious behavior qualifies him to "forfeit" his Sixth Amendment right to counsel. The Court will, however, reluctantly withhold forfeiture in order to give the Defendant one last opportunity to conduct himself befittingly. If Defendant Morton ill-advisedly chooses to persist in engaging in the same course of unjustifiable and egregious conduct he has exhibited thus far, the Court will not hesitate to require him to proceed without the benefit of counsel.